J-A31003-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| IN THE INT. OF: K.S., A MINOR | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: A.S. | No. 740 MDA 2015 |

Appeal from the Decree entered April 6, 2015
in the Court of Common Pleas of York County
Juvenile Division, at No(s): 2014-0143
CP-67-DP-0000057-2013

BEFORE:  PANELLA, J., LAZARUS, J., and PLATT*, J.

MEMORANDUM BY PANELLA, J.                    **FILED FEBRUARY 12, 2016**

A.S. ("Mother") appeals from the Decree entered on April 6, 2015, in the Court of Common Pleas of York County, which involuntarily terminated her parental rights to her male child, K.S., born in June 2011 ("Child"). We affirm.[1]

Mother is the natural mother of Child. Mother currently resides with Child's brother, K., as well as Child's maternal aunt, maternal cousin, and maternal grandmother.

A certification of acknowledgment of paternity was filed on October 14, 2014, indicating that there is no claim of acknowledgment of paternity on file for Child. However, both Mother and Father have held out at all times that

---

*Retired Senior Judge assigned to the Superior Court.

[1] The trial court also terminated the parental rights of Child's father, J.S., Jr., in the final decree entered on April 6, 2015. Father is not a party to this appeal, nor did he file a separate appeal.

Father is the father of Child, and Father's counsel has stipulated that Father is the father of Child.

The York County Office of Children, Youth & Families ("the Agency") filed a Dependency Petition on March 14, 2013. The allegations presented in the petition included that, on December 23, 2012, the Agency received a referral regarding the Child due to concerns of the Child's safety and environmental concerns—Father had allegedly shot Child in the face with a B.B. gun. There were also environmental concerns in the household—the house was filthy and cluttered, and there were no proper sleeping arrangements for Child.

The Agency developed a safety plan and it placed Child with H.R. and S.R. on January 10, 2013. Thereafter, H.R. and S.R. advised the Agency that they would no longer be able to care for Child, and, on March 2, 2013, Child was voluntarily moved by agreement of the parents to the home of K.S. and B.S. B.S. is the daughter of H.R.

Father has been indicated for child abuse through the Department of Public Welfare's Childline for the BB gun incident. The York City Police Department filed charges of endangering the welfare of a child and reckless endangerment against Father, who is himself a minor.

The court held a dependency hearing on April 1, 2013, and adjudicated Child dependent by agreement of all the parties. The trial court found that Child had sustained a serious injury without adequate explanation. There existed parenting issues and the parents lacked stable housing or

employment. The court transferred legal custody to the Agency and placed the Child with K.S. and B.S. Visitation with the parents was to be supervised. The primary goal established was reunification and the concurrent goal was established as placement with a fit and willing relative. Both Mother and Father were directed to undergo psychological evaluations.

In addition, Mother and Father were to sign the necessary releases. They were to maintain safe, stable housing and stable, lawful income. They were also to cooperate with an in-home team and early-intervention services.

An order modifying Child's placement to a second set of emergency caretakers was entered on June 5, 2013. In addition, an order modifying Child's placement was entered on July 1, 2013. At that time, no other relatives were available for placement and Child was placed in foster care. Legal custody remained with the Agency and physical custody was returned to the Agency. Child was then placed with M.B. and M.B. ("foster parents"), who are pre-adoptive resources, and Child has remained continuously in their care.

On March 20, 2013, September 18, 2013, October 21, 2013, February 26, 2014, and August 4, 2014, family service plans were prepared. The objectives established in the March 20, 2013 family service plan included: cooperate with the Agency; cooperate with Justice Works; maintain stable income; maintain stable housing; address their own physical and mental health needs; and connect and bond with Child.

The objectives established for the parents in the September 18, 2013 Family Service Plan included:  obtain/maintain the safety of the child/family; obtain/maintain permanency for the child/family; maintain the well-being of the child/family; and ensure the family/child have a concurrent plan.

The court entered a permanency review order on September 18, 2013. The court made various findings, including:  placement of Child continued to be necessary and appropriate; Mother was deemed substantially compliant with the permanency plan and had made substantial progress toward alleviating the circumstances that necessitated placement; Father was deemed to have no compliance with the permanency plan and had made no progress toward alleviating the circumstances that necessitated placement; legal and physical custody were confirmed with the Agency; and Mother was afforded supervised visitation weekly and was expected to have unsupervised visitation in the near future. Father was afforded weekly supervised visitation but did not exercise it at the time.

A status hearing was held on December 23, 2013. At that time, Mother continued to struggle with employment and housing issues. The objectives established for the parents in the October 21, 2013, February 26, 2014, and August 4, 2014 family service plans remained consistent with the September 18, 2013 plan. A permanency review order was entered on February 26, 2014. The trial court found:  placement continued to be necessary and appropriate; Mother was substantially compliant with permanency plan and had made substantial progress toward alleviating the circumstances that

necessitated placement; Father had no compliance with the permanency plan and made no progress toward alleviating the circumstance that necessitated placement; primary goal remained reunification; adoption remained the concurrent goal; legal and physical custody remained with the Agency; and Mother continued to have supervised visitation for two hours on a weekly basis. Justice Works and/or the Agency were permitted to modify Mother's visitation to partially unsupervised, if deemed appropriate. As part of the plan, Father was to undergo a drug and alcohol evaluation and cooperate with random drug testing.

The court held a status hearing on May 22, 2014. The trial court found that Mother had lost employment prior to that date. In addition, Mother had obtained a mental health assessment through TrueNorth Wellness Services on March 19, 2014. At that time, she was diagnosed with adjustment disorder with mixed disturbance of emotions and conduct disorder, child onset type. Attention deficit disorder of childhood with hyperactivity had been diagnosed from the history of the patient. At that time, Mother was unwilling to participate in therapy related to the various diagnoses.

On March 31, 2014, Mother was discharged from TrueNorth Wellness Services, as she was not seen for any sessions. On December 18, 2014, a psychiatric evaluation was performed at T.W. Ponessa, wherein Mother was diagnosed with attention deficit hyperactivity disorder, predominantly a hyperactive impulsive presentation. As the result of Mother failing to comply with the recommendations of the evaluation, the trial court entered an order

on May 17, 2014, preventing Mother from having unsupervised contact with Child.

The Agency then filed a Motion for Reconsideration. The trial court held a hearing on June 9, 2014, and Mother indicated that she was willing to engage in therapy. The court authorized that Mother was to have unsupervised overnight visits with Child. A permanency review order was entered on August 4, 2014. The placement continued to be necessary and appropriate since Mother was minimally compliant with the permanency plan and had made minimal progress toward alleviating the circumstances that necessitated placement. The primary goal remained reunification; adoption remained the concurrent goal. However, the court determined the established primary goal of reunification was not appropriate or feasible.

A permanency goal was entered on August 4, 2014. Placement continued to be necessary and appropriate. Mother was minimally compliant with the permanency plan and had made minimal progress toward alleviating the circumstances that necessitated placement. However, the court determined that the established primary goal was not appropriate or feasible.

The permanency plan developed on July 17, 2014 was appropriate. In addition, Mother was not making progress toward reunification, although she had made progress in the past. Mother still had not achieved stability or improved parenting skills. Thus, in the permanency order of August 4, 2014, Mother and Father were ordered to maintain safe, stable housing and stable,

lawful income. Mother was to attend counseling and was to cooperate with an in-home team and occupational therapy for Child.

On October 9, 2014, the Agency filed a petition for hearing to change court-ordered goal from reunification to adoption because Mother had made only minimal effort toward alleviating the circumstances that necessitated placement. Father also had not made any progress toward alleviating the circumstances that necessitated placement. Child had been in foster care since April 1, 2013. A petition for involuntary termination of parental rights as to both parents was filed on October 9, 2014.

An evidentiary hearing on the change of goal and termination petitions was originally scheduled for December 16, 2014. At that time Mother's counsel made an oral motion to stay the proceedings based on a bonding assessment that was completed by the Children's Home of York. The motion included a request to increase visits between Mother and Child to determine whether reunification was possible. The request was not opposed. It was determined that all contact between Mother and Child was to be supervised, and the hearing scheduled for December 16, 2014 was continued to February 19, 2015.

A permanency review order was entered on January 20, 2015. Mother was moderately compliant with the permanency plan and had made moderate progress toward alleviating the circumstances that necessitated placement. The primary goal remained reunification; adoption remained the concurrent goal. Visitations between Mother and Child were expanded to

partially supervised. Unsupervised visits between Mother and Child were to be coordinated so that they would occur when the maternal grandmother was present in the home. Maternal grandmother did not appear at either the February 19, 2015 or the March 11, 2015 hearing. The Agency caseworker did not see Child interact with maternal grandmother, despite the trial court's directive that Mother's visits with Child occur at a time when maternal grandmother is present.

At the evidentiary hearing on February 19, 2015, the trial court denied the Agency's petition for change of goal. The court determined that the Agency did not carry its burden to establish that there is a need to change the goal, nor could the Agency offer a feasible alternative goal.

Child refers to the foster parents as "Mommy" and "Daddy." Child refers to Mother as "Mommy." Shayla Kearse from the Children's Home in York performed two bonding assessments. One assessment examined the bond between Child and Mother, and the other assessment examined a bond between Child and the foster parents. Kearse concluded that Child has established a moderate bond to both Mother and foster father, but that Child has a stronger bond with foster mother.

Child attends weekly therapy with Amanda Evans, who is employed by the Children's Aid Society as an art therapist. Child has a continuing need for therapy. In December of 2014, Mother's visits increased. Child's behavior began regressing, and he became more impulsive. Evans is concerned that

Child suffers from an attachment disorder. Child is described as a "friendly" child who seeks affection from strangers.

Mother has been involved with a Justice Works Youthcare in-home team ("Justice Works") since January 2013. Mother's cooperation with the service has fluctuated. The Justice Works team has recently been supervising visits, working on developing household management skills, providing transportation, assisting with job searching, verifying compliance with mental health recommendations, and aiding Mother in assessing community resources. It delivers Child to Mother's home and returns him to his foster parents at the end of each visit. Mother also completed the Nurturing Parenting program twice through Justice Works, once from February 2013 until May 2013 and once from August 2014 until November 2014.

Child has one brother, K., who was born after Child was adjudicated dependent and remains in Mother's care. Although Mother has been provided services through the Agency for the entirety of K.'s life, K. is not subject to the juvenile court jurisdiction.

Mother is unemployed. She applied for cash assistance simultaneously with the filing of the termination petition. Mother's counsel represented at the March 11, 2015 hearing that Mother had obtained employment subsequent to the February 19, 2015 hearing, but evidence was not presented to the trial court to consider. Neither parent has been incarcerated

since Child was adjudicated, and neither parent has been admitted to a drug rehabilitation facility. Mother does not possess a bus pass.

Child has behavioral issues, and he has hit K. At times, Child needs to be redirected, and he has become more uncontrollable when time with him is expanded. At one point Mother sat on Child to gain control of him.

Child has completed occupational therapy. Due to the fact that occupational therapy appointments were scheduled during Mother's visits with Child in the summer of 2014, Mother was to make arrangements to get Child to the appointments. However, the Agency provided the transportation to the appointments since Mother failed to do so. Mother did accompany Child to those appointments, but not to any appointment scheduled outside of the time she had scheduled visits with Child. Child was assessed by Early Intervention, but Child did not have developmental delays. Mother feeds Child when he is at her home for visits and occasionally provides him with clothing.

Mother attends therapy sessions at T.W. Ponessa and she participated in an intake appointment on July 28, 2014 for the purpose of completing a mental health assessment. The counselors expressed concern that Mother was only attending therapy because the trial court had directed her to do so. Mother began to address personal issues, anxiety, and depression. In November 2014, Mother obtained a new therapist, due to the departure of her previous therapist, and began addressing the utilization of behavioral strategies, management of outbursts of anger, and areas of distress. During

Mother's involvement with T.W. Ponessa, Mother has missed only one session and cancelled one.

Mother and Father did not consent to the termination of their parental rights to Child. However, Father believed that it is in Child's best interest for the parental rights of Father to be terminated, and for the Child to be adopted.

Hearings were held on February 19, 2015 and on March 11, 2015. In a final decree and adjudication filed on April 6, 2015, the parental rights of Mother and Father were involuntarily terminated. Mother filed a timely appeal.

Mother raises two issues on appeal.

1. Whether the trial court erred in terminating the parental rights of Mother pursuant to Sections 2511(a)(1), (2), (5), and (8) of the Adoption Act?

2. Whether the trial court erred in concluding that termination of parental rights would best serve the needs and welfare of [Child] pursuant to Section 2511(b)?

Mother's Brief at 5.

We review the termination decree according to the following standard.

[A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion.

- 11 -

Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.

[T]here are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion.

*In re Adoption of S.P.*, 47 A.3d 817, 826-827 (Pa. 2012) (citations omitted).

Termination of parental rights is governed by section 2511 of the Adoption Act, which requires a bifurcated analysis.

Our case law has made clear that under Section 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

- 12 -

*In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citing 23 Pa.C.S.A. § 2511). The burden is upon the petitioner to prove by clear and convincing evidence that the asserted statutory grounds for seeking the termination of parental rights are valid. *See In re R.N.J.*, 985 A.2d 273, 276 (Pa. Super. 2009).

Instantly, the decree terminated Mother's parental rights pursuant to section 2511(a)(1), (2), (5), and (8). This Court must agree with only one subsection of section 2511(a), in addition to § 2511(b), in order to affirm the termination of parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*). Herein, we review the decree pursuant to § 2511(a)(2) and (b), which provide as follows:

**§ 2511. Grounds for involuntary termination**

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

\* \* \*

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing,

- 13 -

furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511.

To satisfy the requirements of section 2511(a)(2), the moving party must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa. Super. 2003). The grounds for termination of parental rights under section 2511(a)(2), due to parental incapacity that cannot be remedied, are not limited to affirmative misconduct; to the contrary those grounds may include acts of refusal as well as incapacity to perform parental duties. *See In re A.L.D.* 797 A.2d 326, 337 (Pa. Super. 2002).

After a careful review of the record, we find that the trial court aptly discussed the evidence against the requirements of section 2511(a)(2) and (b). The trial court properly determined that Child has a need for essential parental care, control, or subsistence that Mother has failed to provide for Child for most of his life. Based on the credible evidence provided, it does not appear that Mother has attended many of Child's therapy appointments.

Mother also has continued to rely on the assistance of the Agency and service providers for transportation. Mother still does not have a bus pass so that she could visit Child or take him to his various appointments.

In addition, Mother needed to complete the parenting class twice because concerns about her ability to safely parent Child arose in the summer of 2014. At that time, Mother sat on Child as the way to control his behavior. Mother also finally obtained a mental health evaluation. The evaluation revealed concerns that Mother may pose a threat of harm to Child if she does not receive counseling. During her counseling sessions, the counselors expressed a concern that Mother attends counseling because the court directs Mother to participate in the sessions. Despite the assistance of Justice Works, Mother remains unemployed and is unable to parent Child.

Mother lacks the motivation to achieve any objectives on her own, and has not demonstrated an ability to independently provide for the emotional, developmental, and physical needs of Child without an extensive amount of assistance. Therefore, this Court finds competent evidence to support the trial court's determination that Mother lacks the capacity to parent Child under § 2511(a)(2).

In reviewing the evidence in support of termination under section 2511(b), our Supreme Court stated that

> if the grounds for termination under subsection (a) are met, a court "shall give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). The emotional needs and welfare of the child

- 15 -

have been properly interpreted to include "[i]ntangibles such as love, comfort, security, and stability." ***In re K.M.***, 53 A.3d 781, 791 (Pa. Super. 2012). In ***In re E.M.***, [620 A.2d 481, 485 (Pa. 1993)], this Court held that the determination of the child's "needs and welfare" requires consideration of the emotional bonds between the parent and child. The "utmost attention" should be paid to discerning the effect on the child of permanently severing the parental bond. ***In re K.M.***, 53 A.3d at 791.

***In re: T.S.M.***, 71 A.3d 251, 267 (Pa. 2013).

With regard to section 2511(b), the evidence reveals that the termination of parental rights is in Child's best interests. The record shows that Mother has not yet demonstrated an ability to adequately address Child's needs, particularly his emotional and developmental needs. In addition, concerns arise regarding the potential impact that Mother's troubled history will have on her ability to provide structure and consistency to Child on a permanent basis.

The evidence also reveals that the Child has a strong emotional bond with his foster parents, especially foster mother, with whom he has been living for an extended period of time, and who take care of all of his needs. Child's foster parents address his speech issues, read to Child, deal with Child's attachment disorder, and help Child create a relationship between himself and the other children who reside with the foster parents. On the other hand, Mother chose to present limited evidence of her bond with Child, relying mostly on the testimony of her Justice Works team members and the bonding assessment. Mother's only offer of testimony included little more

than testimony that she loves Child and has not purchased gifts for Child because he is delivered to her house for visits. Evidence clearly shows that Mother is unable to safely parent child and meet his emotional and developmental needs. The trial court correctly found that there is no evidence that Child would be adversely affected if his relationship with Mother is severed.

The competent evidence in the record shows Mother failed to "exhibit [the] bilateral relationship which emanates from the parent['s] willingness to learn appropriate parenting . . . ." *In re K.K.R.S.*, 958 A.2d 529, 534 (Pa. Super. 2008). She did not put herself in a position to assume daily parenting responsibilities so that she could develop a real bond with Child.  *See In re J.L.C.*, 837 A.2d 1247, 1249 (Pa. Super. 2003).

Although Mother may love Child and desire an opportunity to serve as his mother, a parent's own feelings of love and affection for a child, alone, will not preclude termination of parental rights. *See In re Z.P.*, 994 A.2d 1108, 1121 (Pa. Super. 2010). A child's life "simply cannot be put on hold in the hope that [a parent] will summon the ability to handle the responsibilities of parenting."  *Id*. at 1125. Rather, "a parent's basic constitutional right to the custody and rearing of his child is converted, upon the failure to fulfill his or her parental duties, to the child's right to have proper parenting and fulfillment of his or her potential in a permanent,

healthy, safe environment." ***In re B., N.M.***, 856 A.2d at 856. As such, Mother's issue fails with respect to section 2511(b).

Accordingly, we affirm the decree terminating Mother's parental rights to the Child.

Decree affirmed.


Judgment Entered.

_____

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/12/2016